

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/21/2009

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DWAYNE KEITH DONELSON | § | |
| ZINA BERNADETTE DONELSON | § | |
|     DEBTOR(S) | § | CASE NO. 07-38467-H5-7 |
| | § | |
| WOO, INC. D/B/A WINDOWS OF | § | |
| OPPORTUNITY AND | § | |
| MARTINA ALBERS | § | |
|     PLAINTIFF(S) | § | ADVERSARY NO. 08-3054 |
| | § | |
| VS. | § | |
| | § | |
| DWAYNE KEITH DONELSON | § | |
| ZINA BERNADETTE DONELSON | § | |
|     DEFENDANT(S) | § | |

**MEMORANDUM OPINION REGARDING FIRST AMENDED COMPLAINT
OBJECTING TO DISCHARGE OF THE DEBTOR AND TO DETERMINE
DISCHARGEABILITY OF CERTAIN DEBTS**

Before the Court is the First Amended Complaint of Woo, Inc. d/b/a Windows of Opportunity and of Martina Albers objecting to debtors' discharge under 11 U.S.C. § 727(a)(2) and (a)(4)(A); and to the dischargeability of a debt under 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6).[1] This Court has jurisdiction of this proceeding under 28 U.S.C. §§ 1334 and 157. This is a core proceeding.

---

[1] Although Woo, Inc. is named as one of two plaintiffs in the instant adversary proceeding, there is no evidence that Woo, Inc. participated in the events described herein. The evidence shows that Martina Albers acted in her individual capacity and suggests that Windows of Opportunity is a name under which Albers, individually, rather than Woo, Inc., was doing business.

P:\Woo v. Donelson.wpd 090713.1159

## I. Facts

In 2007, Martina Albers owned and operated two window treatment businesses, Windows of Opportunity and Drapery Gallery and Design Center. At the time, Dwayne Donelson had a business, National Home Store, selling 200 units of window blinds per week to builders. In February 2007, a vendor, Signature Window Coverings, that sold goods to both Albers and Donelson, took judgment against Dwayne Donelson for $10,541.24 in Cause No. 876,420 in the County Civil Court at Law One of Harris County, Texas.

On March 1, 2007, Albers sold Drapery Gallery and Design Center to Dwayne Donelson. Drapery Gallery and Design Center consisted of a show room with sample books, a computer, a couple of sewing machines, and a customer database. Albers was referred to Donelson by a window treatment installer. Prior to the sale, Albers asked Donelson how long he had been in the business and "asked around" whether there was any reason she should not be doing business with Donelson. Prior to the sale, Albers showed Donelson that Drapery Gallery and Design Center was generating $20,000 per month and had her CPA meet with Donelson to show him that the business' bills were all paid. Although Albers shared financial information with Donelson, she testified that she never asked Donelson for any financial information from him.

Albers sold Drapery Gallery and Design Center to Donelson for $48,000. Pursuant to the terms of the purchase agreement prepared and signed by Albers on February 27, 2007, and signed by Donelson on March 1, 2007, Donelson gave Albers three checks in the amount

of $16,000 each, dated March 1, 2007, May 1, 2007, and July 1, 2007. Albers was to deposit each check on the 10th day of the month it was dated. Albers testified that she had wanted the two post-dated checks so she "would not have to go chasing" Donelson. In addition to the sales price, Donelson agreed to pay the $1,500 rent due on the business premises for March 2007 and to transfer utilities and other services into his name.

Zina Donelson is a hairdresser earning about $1,200 per month. Zina Donelson testified to her surprise when she learned that her husband had a contract with Albers to buy her business. Zina Donelson testified that she was surprised that Albers had not asked about the couple's bank statements, but after hearing Albers talk about the business like it would make "megabucks," Zina Donelson hoped that the business "would pay for itself."

In early March 2007, Albers filed an abandonment of the assumed name "Drapery Gallery and Design Center" with the county clerk's office. Zina Donelson signed paper work to transfer utilities and services from Albers to the Donelsons as the new owners of the business and opened a bank account for the business. Zina Donelson worked in the showroom and Dwayne Donelson conducted the firm's business "in the field." In addition, one of Zina Donelson's two daughters, who was also attending school at the time, helped in the showroom. During this time period, Albers deposited the first $16,000 check.

On March 14, 2007, the judgment creditor, Signature Window Coverings, obtained an order appointing a receiver, Michael Stein, to take possession of and sell the assets of Dwayne Donelson individually and doing business as National Home Store. Albers testified

that around the 15th or 17th of March 2007, she received a cell phone call from Michael Stein telling her that he was the receiver for Donelson and his business and that his bank account was frozen. The first $16,000 check was returned unpaid for insufficient funds. After Albers received Stein's call, she called Donelson to find out how he would make the checks good. Donelson denied that he was in receivership, but agreed to satisfy the $16,000 due.[2]

The Donelsons met with Albers and her attorney about a substitute means of making the first $16,000 payment. The Donelsons told Albers that they "wanted to make good" on the bounced check, but that they could not give her the entire amount all at once. Albers agreed to take installment payments to satisfy the first $16,000 due. Ultimately, the Donelsons gave Albers a $5,000 cashiers check and made two charges, for $4,000 and $7,000, to Zina Donelson's American Express card at Albers' place of business in the presence of Albers and Albers' attorney.[3]

---

[2]Michael Stein notified Donelson of the receivership one month later, by letter dated April 12, 2007. Donelson testified that he did not know what a receivership was. The Donelsons first became aware of the receivership when they learned the bank account was frozen. Donelson testified that at some point his attorney showed him the receivership order and told him to provide to the receiver the financial documentation listed in the order. Donelson testified that his attorney had not told him to turnover any cash to the receiver.

[3]According to Albers, she told Stein about receiving $5,000 from Donelson, but did not inform the receiver of any other funds she received because she knew that Stein "was aware of the situation and if they were going to come after me he would contact me."

On April 30, 2007, Albers and the Donelsons executed a written assignment of Albers' lease with State Venture, Ltd., the landlord of the business premises.[4] Under the assignment, effective April 1, 2007, the Donelsons agreed to pay the landlord $1,500 per month through the end of Albers' lease term, July 31, 2008. Zina Donelson testified that the landlord did not sign the lease assignment, but had required both Donelsons to sign it. According to Zina Donelson, she told Albers that she had nothing to do with Albers' contract with Dwayne Donelson, but "we signed [the assignment] rush, rush, in Mr. Gilbert's office."

The Donelsons timely paid the landlord the $1,500 rent due for March 2007 for the business premises. No one paid the rent for the next three months, however, and the landlord locked the Donelsons out of the premises. Albers testified that when the June rent was due, "the landlord told me that if I did not come up with $4,500 in five days there would be a lawsuit on me." Albers paid the three months rent and had Dwayne Donelson repay her with a cashiers' check when he wanted back into the property that summer.

Despite her knowledge that Stein had frozen Donelson's bank account and that the first $16,000 check had been returned unpaid, Albers deposited the two post-dated $16,000 checks, explaining at trial that Donelson had "never told her to do anything" with the two post-dated checks and "I had no choice but to try to get my money." The checks were returned unpaid.

---

[4] The assignment of lease also names C.M. Rogers as "assignor," but this person's relationship to Albers and the Donelsons was not explained at trial.

Donelson testified that he was trying to renegotiate the terms of the purchase and that Albers and her attorney knew the account was levied when she ran the checks, but they had not wanted to change the arrangement. Donelson suggested that Albers call Signature Window Coverings, since Albers was also a customer, to work out something.

When Albers received notice that the checks did not clear the bank, she called Donelson and told him this fact. Albers testified that Donelson called her office and asked her why she had deposited the checks when she knew that there was no money in the account and had responded that that was why the contract had said 10 days and that she "did not want to go chasing him."

The Donelsons ceased operating the business in August 2007. When they closed the store, debtors left the contents in place because they could not pay the remaining debt to Albers. Zina Donelson testified, "We left everything there because we did not think it was our property. Dwayne felt bad. We tried to call [Albers] and she would not call us back."

At some point, Albers saw that the business premises appeared disheveled and called the landlord to see whether he had been paid in full. Albers testified that "John Gilbert told me to wait, he would meet me there." According to Albers, the power had been turned off and at that point the landlord changed the locks.

Dwayne Donelson testified that he had thought the business would generate sufficient funds to pay the purchase price to Albers, but that the business never grossed the $20,000

monthly that Albers had said it would. Under the Donelsons' management, the business grossed only $5,000 to $10,000 per month and never made a profit.

Albers testified that the business had been her "baby" and had been successful when she ran it. Albers testified that in selling Donelson her business, she had given him "an excellent, excellent deal."

Albers testified that it would have been important to know there was a judgment against Dwayne Donelson at the time she sold him the business because, "These vendors are like family. You can't hurt one of us without it having a chain reaction and hurting all of us. I mean you really don't want to get involved in someone not paying their vendors, it hurts everybody." Albers testified that she felt disappointed that Donelson had told her that he was not in receivership. Regarding the Donelsons' efforts to replace the first $16,000 check when it was returned unpaid, Albers testified she thought the Donelsons "knew they had to make that check good" because "the D.A. could go after them for fraud for that first check," but that the D.A. had said "he could not do anything about the postdated checks."

The Donelsons filed a voluntary chapter 7 bankruptcy petition on December 4, 2007. The Donelsons filed schedules and a statement of affairs. The Donelsons did not schedule the bank account for National Home Store or two bank accounts upon which Zina Donelson is an authorized signatory. Albers contends that because of these omissions, the Donelsons' discharge should be denied for violation of 11 U.S.C. § 727(a)(2) and (a)(4)(A).

At trial, the Donelsons explained that they had not thought they were required to schedule the three bank accounts. Dwayne Donelson testified that he had not scheduled National Home Store's bank account because the bank had closed the account six months prior to the bankruptcy filing. Zina Donelson testified about the Washington Mutual bank accounts.

Zina Donelson's two daughters are 20 and 25 years old. The younger daughter is disabled and is entitled to payments from the Social Security Administration. When her disabled daughter ceased attending school, SSA mistakenly stopped her payments. The error was eventually corrected and the Washington Mutual account was opened in November 2007 to receive the renewed payments. The account was opened in the names of both daughters and Zina Donelson so that both Zina Donelson and her older daughter could use the account to take care of the younger daughter's needs. In addition to deposits from SSA, the older daughter deposits her earnings into the account and uses the account as her personal checking account. Zina Donelson testified that she uses the account solely to pay for her younger daughter's needs and accounts to SSA quarterly for expenditures.

The other unscheduled Washington mutual account is owned by Zina Donelson's father and was opened January 31, 2007. According to Zina Donelson, her father cannot spell well, was laid off from work, and one of his legs has been amputated for which he receives payments from SSA. When Zina Donelson's mother passed away, her father could not take care of himself and took out a reverse mortgage on his home. The Washington

Mutual account contains the proceeds of the reverse mortgage and her father's SSA payments. Zina Donelson writes checks for her father on the account.

In addition to seeking denial of debtors' discharge, Albers contends that her debt should not be discharged under 11 U.S.C. § 523(a)(2), 523(a)(4), and 523(a)(6).[5] Albers contends that the Donelsons committed fraud by (1) writing three $16,000 checks knowing that they did not have sufficient funds to pay the checks; (2) entering into the contract to buy the business with no present intention to pay the purchase price; and (3) failing to disclose that a judgment had been taken against Dwayne Donelson and National Home Store and that the judgment creditor was seeking the appointment of a receiver. Albers contends that damages consist of: (1) $32,000.00 for the amount remaining due under the contract to buy Drapery Gallery and Design Center and (2) the amount of rent due under the assignment of lease.[6]

## II. Conclusions

Bankruptcy Code § 523 provides:

---

[5] Plaintiff pled that her debt is not dischargeable under 11 U.S.C. § 523(a)(2), without distinguishing between subparts (A), (B), and (C) which require very different proof. The Court finds without discussion that plaintiff has failed to prove that her debt is non-dischargeable under subparts (B) or (C).

[6] Albers did not introduce any evidence of the amount of rent, if any, that remains unpaid to the landlord for which the Donelsons are obligated under the lease assignment. When asked to quantify the amount of rent she sought, Albers testified that she had paid the landlord for the three months rent due for April, May, and June, 2007, and that Donelson had repaid her by cashier's check. Albers offered no evidence that any rent remains unpaid from the time the Donelsons abandoned the premises through the end of her lease term.

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(2)(A); (a)(4); and (a)(6).

To prove a debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), plaintiff must prove that debtor's misrepresentations were: (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party. Matter of Allison, 960 F.2d 481, 483 (5th Cir. 1992). A promise to perform acts in the future is not a qualifying misrepresentation merely because the promise subsequently is breached. Id. at 484. A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised. Id. Proof of actual reliance, rather than reasonable reliance, is sufficient under 11 U.S.C. § 523(a)(2)(A). Id. at 485.

When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation. In re Mercer, 246 F.3d 391, 404 (5th Cir.2001). A misrepresentation need not be spoken; it can be made through conduct. Id.

A duty to speak arises by operation of law when (1) a confidential or fiduciary relationship exists between the parties; (2) a party learns that his previous statement was false and misleading; (3) a party knows that the other party is relying on a concealed fact and does not have an equal opportunity to discover the truth; or (4) a party makes only a partial disclosure of material facts that, absent a full disclosure of the facts, conveys a false impression. Union Pacific Resources Group, Inc. v. Rhone-Poulenc, Inc., 247 F.3d 574, 586 (5th Cir.2001).

The Court finds that Dwayne Donelson made no fraudulent misrepresentations to Albers. Albers failed to prove facts establishing that at the time she sold her business to him, Dwayne Donelson had a duty to speak. Albers and Donelson do not have a confidential or fiduciary relationship. Donelson made no statements to Albers that were false or misleading and made no partial disclosures that conveyed a false impression. Albers has not shown that Donelson knew she was relying on any concealed facts or that she did not have an equal opportunity to discover any concealed facts.

Albers has not shown that the existence of a $10,000 judgment against Donelson or the possibility of a receivership were facts that would have been material to her decision to sell her business to Donelson, which at the time was making $20,000 per month. Indeed,

Albers has not complained that the dollar amount of the judgment was so great as to present an impediment to Donelson's ability to make the payments due under the contract. Albers' contention that these facts were material and her testimony implying that she would not have done business with Donelson had she known he had failed to pay a vendor, because vendors are "like family," are belied by her actions once she became aware of the unpaid vendor, the judgment and the receivership. After she became aware of the unpaid vendor, the judgment and the receivership, Albers accepted alternate funds for the initial $16,000 check, deposited the two post-dated checks, entered into an assignment of her lease with the Donelsons, and allowed the Donelsons back into the business premises when they were locked out by the landlord, all without regard to whether the unpaid vendor had been made whole. The Court concludes that the existence of an unpaid vendor, the judgment and the receivership were not material facts that should have been disclosed to Albers prior to the sale. The evidence shows that the only facts Albers at the time of the sale considered material to her decision to sell were the recommendation of Donelson by a window treatment installer and the responses she received when she "asked around" about whether she should do business with Donelson.

Albers has failed to prove that at the time Donelson entered into the contract to buy the business, he had no intention to perform under the contract. Indeed, the evidence shows to the contrary. The evidence shows that at the time he executed the contract, Donelson performed under the contract by: (1) paying the rent due for March 2007, (2) giving Albers the three checks for $16,000, and (3) transferring utilities and other services out of Albers'

name and into the name of the Donelsons. Moreover, not only Donelson, but other family members devoted their time and labor to the business. Under the Donelsons' ownership, the business simply never generated the income stream that Albers had said it produced when she owned it.

The evidence shows that at the time they entered into the contract, both Albers and Donelson expected the income from the business to be sufficient to pay the two post-dated $16,000 checks that Albers had required as part of the purchase price. Albers has not shown that Donelson knew that a third party would levy on the account on which the three checks were drawn. Albers has not shown that at the time Donelson gave her the three checks, the account upon which they were drawn had insufficient funds to pay the check dated March 1, 2007. The check itself is not a representation as to the state of the drawer's bank balance. Williams v. U. S., 458 U.S. 279, 284-285 (1982). In Williams, the Supreme Court concluded that a check is not a representation that the drawer currently has funds on deposit sufficient to cover the face value of the check, as it is equally plausible that a check represents that the drawer will have sufficient funds deposited in his account by the time the check clears, or that the drawer will make good the face value of the draft if it is dishonored by the bank. Id. See also U.S. v. Medeles, 916 F.2d 195 (5th Cir. 1990). The Court concludes that Albers has failed to prove that her debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

Next, Albers contends that her debt is not dischargeable under 11 U.S.C. § 523(a)(4) as one for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Under § 523(a)(4), the term "fiduciary" is limited to instances involving express or technical trusts. Matter of Tran, 151 F.3d 339, 342 (5th Cir.1998). The facts of the instant matter do not involve an express or technical trust, and, therefore, Albers has failed to prove that her debt is for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

Where the debtor has come into possession of a creditor's property lawfully, embezzlement, rather than larceny, is the §523(a)(4) term that applies. Matter of Miller, 156 F.3d 598, 602 (5th Cir. 1998). The Court finds that Donelson acquired Albers' business lawfully, therefore, Albers must prove embezzlement to avoid discharge of her debt under §523(a)(4). For purposes of § 523(a)(4), "embezzlement" is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. Id. To meet the definition of "embezzlement," there must be proof of the debtor's fraudulent intent in taking the property. Id. at 602-603. Albers has failed to prove that Donelson acted with fraudulent intent when he acquired her business. The Court concludes that Albers has failed to prove that her debt should be excepted from discharge under 11 U.S.C. § 523(a)(4).

Albers, lastly, seeks to except her debt from discharge under 11 U.S.C. § 523(a)(6) as one for willful and malicious injury by the debtor to another entity or to the property of

another entity. For a debt to be excepted from discharge under 11 U.S.C. § 523(a)(6), the creditor must prove a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998). Proof of a debt based on a "knowing breach of contract" is insufficient under 11 U.S.C. § 523(a)(6), as is proof of a debt arising from recklessly or negligently inflicted injuries. <u>Id.</u> at 62-64. The Court finds that Albers' debt arises solely from a breach of contract. The Court concludes that Albers has failed to prove that her debt should be excepted from discharge under 11 U.S.C. § 523(a)(6).

Bankruptcy Code § 727(a)(2) states:

(a) The court shall grant the debtor a discharge, unless--

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case--
(A) made a false oath or account;

11 U.S.C.§ 727(a)(2) and (a)(4)(A).

To establish a claim under § 727(a)(2)(A), the plaintiff must prove (1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate. <u>In re Duncan</u>, 562 F.3d

688, 698 (5th Cir. 2009). Proof of actual intent is necessary, constructive intent is inadequate. Id. Actual intent may be inferred from the debtor's actions and circumstantial evidence. Id.

Albers has not identified any property transferred, removed, destroyed, mutilated, or concealed, by the Donelsons either before or after their bankruptcy filing. To the extent that Albers contends that debtors' failure to schedule the bank accounts of National Home Store, Zina Donelson's daughters and Zina Donelson's father constitutes concealment of the funds on deposit in those accounts, the Court finds that there is no evidence that any funds deposited into Zina Donelson's daughters or father's accounts were property of the debtors or property of the bankruptcy estate. As to the funds on deposit in National Home Store's account until it was closed by the bank, the Court finds no evidence that the Donelsons concealed or failed to disclose the account with intent to hinder, delay, or defraud a creditor or an officer of the estate. Albers has failed to prove that the Donelsons' discharge should be denied under 11 U.S.C. § 727(a)(2)(A).

To prove a violation of 11 U.S.C.§ 727 (a)(4)(A), a plaintiff must prove by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case. In re Duncan, 562 F.3d 688 at 695. False oaths sufficient to justify the denial of discharge include a false statement or omission in the debtor's schedules . Matter of Beaubouef, 966

F.2d 174, 178 (5th Cir. 1992). An omission is material if the omitted information bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. Id. Albers identified three bank accounts that debtors omitted in their schedules, the account of National Home Store, the account of Zina Donelson's daughters, and the account of Zine Donelson's father.

The Court credits Zina Donelson's testimony that she did not realize that she should schedule her daughters' bank account or her father's bank account. The Court finds that the omitted bank accounts of Zina Donelson's daughters and father do not contain any funds belonging to the Donelsons or to the bankruptcy estate. The omitted accounts of Zina Donelson's daughters and father do not pertain to debtors' business or personal financial dealings or assets. The Court finds that neither Donelson acted with fraudulent intent in failing to schedule Zina Donelson's daughters' bank account or her father's bank account.

Dwayne Donelson testified that he did not schedule the bank account of National Home Store because it has been closed by the bank six months prior to the bankruptcy filing.

The Court finds that neither of the Donelsons acted with fraudulent intent in failing to schedule the closed bank account of National Home Store. The Court finds that plaintiffs have failed to prove that debtors' discharge should be denied under 11 U.S.C. § 727 (a)(4)(A).

Signed this 20th day of July, 2009 at Houston, Texas.

_____
KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE